

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DULAZIA BURCHETTE,

                              Plaintiff,                    **DECISION AND ORDER**

        -against-                                          19 Civ. 5402 (PED)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
-------------------------------------------------------X
**PAUL E. DAVISON, U.S.M.J.**


     Plaintiff Dulazia Burchette brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c) seeking judicial review of a final determination of the Commissioner of Social Security

(the "Commissioner") denying her application for disability benefits.[1]  This case is before me for

all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) (Dkt. #11).

     Presently before this Court are the parties' cross-motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. #19 (plaintiff's motion),

#20 (plaintiff's memorandum of law), #23 (defendant's cross-motion) and #24 (defendant's

memorandum of law)).  Plaintiff argues, as the basis for her motion, that the Administrative Law

Judge ("ALJ") erred because he: (1) incorrectly discounted plaintiff's testimony about her

symptoms and conditions; (2) failed to obtain medical source statements from plaintiff's treating

sources; and (3) relied heavily upon a consultative examiner's opinion, which was based upon a

"snapshot" evaluation of plaintiff's mental impairments.  Dkt. #20, at 10-13.  Defendant asserts,

---

    [1] Plaintiff alleges entitlement to two types of disability-related benefits under the Social
Security Act:  Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").
Because the definition of "disabled" governing eligibility is the same for DIB and SSI, the term
"disability benefits" refers to both.  See Paredes v. Comm'r of Soc. Sec., No. 16 Civ. 810, 2017
WL 2210865, at *1 n.1 (S.D.N.Y. May 19, 2017); 42 U.S.C. §§ 423(d), 1382c(a)(3).

in response, that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. Dkt. #24, at 10-15. For the reasons set forth below, plaintiff's motion is **DENIED** and defendant's motion is **GRANTED**.

## I. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, filed by defendant on August 14, 2019 (Dkt. #12).

A. Application History

On or about April 4, 2016, plaintiff filed her claims for disability benefits, alleging that she had been disabled since February 22, 2016 due to a mental disorder and depression. R. 60, 68, 185-200. Her claims were administratively denied on or about May 19, 2016. R. 78, 82, 84. Plaintiff requested a hearing before an ALJ; a hearing was held on April 24, 2018 before ALJ Michael D. Shilling. R. 34-59, 888. Plaintiff appeared with counsel and testified at the hearing. R. 38-55.[2] On August 6, 2018, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). R. 20-29. The ALJ's decision became the final order of the Commissioner on April 9, 2019, when the Appeals Council denied plaintiff's request for review. R. 1-6. This action followed.

B. Mental Health Treatment

On March 9, 2016, plaintiff went to the North Central Bronx Hospital Emergency Department because she was depressed, not sleeping and not eating. R. 297-98. An attending physician noted that plaintiff had been drinking alcohol. R. 298. Plaintiff was calm and oriented to person, place and time. R. 297. There was no indication that she was a suicide risk. Id.

---

[2] Vocational expert Janet Hasgard also testified at the hearing. R. 55-58.

Plaintiff was not confused, irritable, loud, unruly or threatening (physically or verbally). R. 298. Plaintiff asked to speak to a psychiatrist. Id.

On March 16, 2016, plaintiff was evaluated at Montefiore Behavioral Health Center by Licensed Clinical Social Worker {"LCSW") Jenny Mintz. R. 318-26. Plaintiff reported depression which affected her social life and caused her to take a leave of absence from work in February 2016. R. 318, 320. She stated that symptoms began four years earlier, after an incident with the police (who allegedly assaulted her while she was holding her infant daughter and then arrested her), after which she experienced hypervigilance and nightmares about the event. R. 318. Plaintiff reported increasing intensity of symptoms, which made it "extremely difficult" to do her work, take care of things at home and get along with other people. R. 318, 322. She stated that she lives with her mother, brother and daughter, with whom she has positive relationships. R. 319. Plaintiff reported using alcohol "a few times a week to feel better." R. 320. Plaintiff was cooperative upon mental status examination, her behavior was appropriate, her speech was normal, her mood was calm and her affect was constricted. R. 321.[3] Plaintiff's thought process was logical and goal directed and her thought content was unremarkable. Id. Her cognition, memory, attention, concentration, fund of knowledge and impulse control were intact. R. 321-22. Plaintiff exhibited no hallucinations, illusions or suicidal/homicidal ideation, plan or intent. Id. Her insight and judgment were good. R. 322. LCSW Mintz diagnosed PTSD and a moderate, recurrent episode of major depressive disorder, and stated that she "will continue to assess" plaintiff, who was scheduled to return in two weeks. R. 318, 322.

---

[3] "A restricted or constricted affect describes a mild restriction in the range or intensity of display of feelings." The Gale Encyclopedia of Mental Health, © 2019 Encyclopedia.com, https://www.encyclopedia.com/medicine/psychology/psychology-and-psychiatry/affect (accessed September 9, 2020).

Plaintiff returned on March 30, 2016 and reported "that she has been okay and that some days are better than others." R. 323.  She stated that she had gone on a date with a man that morning and, when she found out he was a cop, "her heart was pounding fast and she worried that he worked in the same precinct" as the officers who allegedly assaulted her.  Id.  She reported "that new neighbors moved in, and she worried that police were moving next door to watch her."  Id.  Plaintiff was cooperative upon mental status examination but her mood was anxious; her behavior was appropriate, her affect was full/appropriate and her speech was normal.  R. 325.  Her thought process was logical and goal directed; her thought content was paranoid (and LCSW Mintz was unable to assess whether delusions were present).  Id.  Plaintiff's cognition, memory, attention, concentration, fund of knowledge and impulse control were intact.  Id.  Her judgment and impulse control were good, and she exhibited no suicidal/homicidal ideation, plan or intent.  Id.  LCSW Mintz noted that plaintiff "is not yet prescribed medication" and that she would return in two weeks.  R. 325-26.

On April 22, 2016, plaintiff reported for a psychiatric evaluation with NP Diane Quigley.  R. 327-29.  Plaintiff reported anxiety and depression, worsening since an incident with police in 2012.  R. 327.  Findings on mental status examination were generally unremarkable (consistent with previous evaluations), except that plaintiff's mood was anxious and depressed, and her thought content reflected paranoid delusion.  R. 329.  NP Quigley discussed treatment options, including medication management, prescribed hydroxyzine and sertraline (Zoloft®) and instructed plaintiff to return in four to six weeks.. R. 329-30.

Plaintiff returned to LCSW Mintz on May 5, 2016.  R. 330.  She reported "that she doesn't like the idea of medication but has started taking it."  Id.  She also reported that she continues to feel paranoia "all the time."  Id.  Mental status examination findings were, again,

generally unremarkable, except plaintiff's mood was anxious, her thought content reflected paranoid delusion and her insight was fair. R. 332. Plaintiff was directed to return to LCSW Mintz in two weeks. R. 333.

On May 26, 2016, plaintiff returned to NP Quigley. R. 334. She reported taking hydroxyzine as needed for anxiety "and finds it helpful." Id. She stated that she began taking Zoloft consistently two to three weeks earlier. Id. Plaintiff reported no side effects from the medication. R. 336. Mental status examination findings were, once again, generally unremarkable, except her thought content reflected preoccupations. R. 335. NP Quigley renewed plaintiff's prescriptions and instructed her to continue therapy and return for medication management in two months. R. 336.

Plaintiff returned to LCSW Mintz on June 2, 2016 and reported medication compliance with some side effects (tiredness and blurry vision). R. 337. Plaintiff stated that she wanted to return to work (but not to her previous job), and that she needed to make money and wanted to leave the house more. Id. Ms. Mintz reported unremarkable mental status examination findings and noted that plaintiff would return in two weeks. R. 338-39.

Plaintiff was absent from treatment for three months, then returned to LCSW Mintz on September 15, 2016. R. 340. Plaintiff reported "that her mood has been generally stable lately" and that she was looking for work. Id. LCSW Mintz reported unremarkable mental status examination findings, except for plaintiff's insight (which Ms. Mintz assessed was fair). R. 341-42. Plaintiff was scheduled to return in two weeks. R. 342.

On January 25, 2017, plaintiff's case was closed "due to 90 days of inactivity." R. 345. LCSW Mintz noted that plaintiff "did not participate in medication management and/or psychotherapy at the recommended frequency" and did not respond to outreach efforts. Id.

Almost a year later, plaintiff sought readmission for treatment at Montefiore Behavioral Health Center  and was evaluated by Licensed Mental Health Counselor {"LMHC") Doreen Stewart. R. 347-52.  Plaintiff reported continued anxiety and stated she was taking medication which she obtained from an emergency room visit during the past year. R. 347.  She stated that she had not been taking care of her appearance and got her nails done the week prior (after a year); she was also wearing makeup. Id.  Plaintiff reported that she lives with her extended family (who all get along) and that her boyfriend helps out with her finances (in addition to public assistance). R. 348.  Upon mental status examination, plaintiff' mood was anxious and her insight was fair; finding were otherwise unremarkable. R. 350-51.  LMHC Stewart assessed anxiety disorder and moderate, recurring, major depressive disorder. R. 351.  She noted that, although plaintiff reported memory problems, she was able to complete a short term memory task and had good attention and concentration skills. Id.  Ms. Stewart speculated: "It could be that during periods of anxiety [plaintiff's] ability to concentrate, attend and recall become impaired." Id.

On January 18, 2018, plaintiff was seen by LCSW Mintz. R. 352.  Plaintiff reported panic episodes, thinking a lot about death and a lack of motivation. Id.  She stated that she uses shopping and makeup to keep herself occupied; she reported using alcohol but did not give details about how much. Id.  Plaintiff reported that she lived alone with her daughter, and that she feels alone and anxious "when her boyfriend is not there." Id.  Upon mental status examination, Ms. Mintz noted plaintiff's mood was anxious, her speech was talkative and rapid, and her insight and impulse control were fair; findings were otherwise unremarkable. R. 354-55.

Plaintiff saw LCSW Mintz again on January 26, 2018, February 1, 2018, February 15, 2018, and February 27, 2018. R. 359, 363, 366, 369.  At each of those visits, Ms. Mintz noted

substantially unremarkable findings, with the following exceptions: anxious mood, insight fair, impulse control fair on January 26; anxious mood and insight fair on February 1; insight fair on February 15; and anxious mood, insight fair on February 27. R. 361, 364-65, 368, 371-72.

Immediately following her visit with LCSW Mintz on February 27, plaintiff saw NP Rattray for a psychiatric evaluation and medication management. R. 373-77. Plaintiff reported depression, anxiety and panic attacks and acknowledged that she sometimes manages her symptoms with alcohol. R. 373. Mental status examination findings were generally unremarkable, except plaintiff's attitude was guarded, her mood was anxious and her judgment was fair. R. 376. Ms. Rattray prescribed Klonopin and Lexapro. R. 377.

Plaintiff returned to LCSW Mintz on April 3, 2018. R. 378. Plaintiff reported increased panic episodes and said she has been mostly staying inside. Id. She stated she was with her boyfriend for the weekend and feels safe inside his house, "but gets panicked when outside." Id. She also stated she had picked up her new medications but had not started them because she did not remember the dosage directions. Id. Plaintiff reported that she was still taking previously-prescribed Hydroxyzine, which makes her drowsy and possibly more anxious. Id. Plaintiff presented as quite drowsy; she reported taking Hydroxyzine before the appointment. Id. Mental status examination findings were mostly unremarkable, except plaintiff's mood was anxious and her insight was fair. R. 380.

The next, and final, mental health treatment note in the record reflects plaintiff's medication follow-up visit to NP Rattray on April 18, 2018. R. 382. Plaintiff reported continuing anxiety and panic attacks. Id. She stated that she had not yet taken the newly-prescribed medications because she is still drinking alcohol (although she had not had a drink in three days). Id. Upon mental status examination, plaintiff's mood was anxious and her insight

-7-

was fair; findings were otherwise unremarkable. R. 384.

C. Consultative Psychiatric Evaluation

On May 13, 2016, psychiatrist Ruby Phillips conducted a consultative examination of plaintiff. R. 312-15. Dr. Phillips noted that plaintiff lived with her mother, brother and five-year-old daughter, and arrived to the appointment by bus. R. 312. Plaintiff reported that she had worked for six years as a supervisor at a coffee shop, but left in February 2016 due to depression and anxiety. Id. She stated that she has been drinking alcohol since she was teenager and that she currently drinks most days (several drinks per day). R. 313.

Plaintiff reported symptoms of depression (dysphoric mood and sadness); she denied suicidal/homicidal ideation, intent or plan. R. 312. She reported symptoms of anxiety (excessive apprehension, nightmares and hypervigilance), Id. She also reported panic attack symptoms (dizziness, breathing difficulties and chest pain) which she stated occurred four times a week, with no specific trigger. Id. Plaintiff complained of short-term memory deficits and concentration difficulties. Id. She reported that she takes care of her personal needs, shops, manages her money and takes public transportation (with anxiety). R. 314. Plaintiff reported good family relationships and "very limited" socialization; her hobbies and interests included going to the park with her daughter. Id. She stated that she spends her days lying down and praying. Id.

Plaintiff was cooperative during the mental status exam, and her manner of relating was adequate. R. 313. Dr. Phillips noted that plaintiff was appropriately dressed and well-groomed, and her eye contact was appropriate. Id. Plaintiff's posture and motor behavior were normal; her speech was fluent, her voice was clear and her speech and language skills were adequate. Id. According to Dr. Phillips, plaintiff's thought processes were "[c]oherent and goal directed with

no evidence of hallucinations, delusions, or paranoia in the evaluation setting" and she was oriented to person, place, and time. Id. Plaintiff's affect was anxious and her mood was neutral. Id. Dr. Phillips noted that plaintiff's attention and concentration were intact, and she was able to count and perform simple calculations and serial 3's. Id. The doctor also noted that plaintiff's recent and remote memory skills were intact, that she was able to recall 3/3 objects immediately and 3/3 after five minutes, and that she could recall five digits forward and four digits backward. R. 314. Dr. Phillips estimated that plaintiff's intellectual functioning was average. Id. The doctor also noted that plaintiff's general fund of information was appropriate to experience, and that her insight and judgment were fair. Id.

Dr. Phillips evaluated plaintiff's functional abilities as follows: (1) plaintiff can follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, perform and learn new tasks, perform complex tasks independently and make appropriate decisions; (2) plaintiff is moderately limited in her ability to relate adequately with others and appropriately deal with stress. R. 314. Dr. Phillips opined that plaintiff's moderate limitations were caused by anxiety, but her psychiatric problems do "not appear to be significant enough to interfere with [her] ability to function on a daily basis." Id. Dr. Phillips diagnosed panic disorder and rule out PTSD. R. 315. She assessed plaintiff's prognosis as "good, given adequate treatment and resolution of current psychosocial stressors" and recommended that she continue with therapy and medication "as currently provided." Id.

D. State Agency Review Assessment

On May 18, 2016, State Agency Psychological Consultant A. Chapman reviewed the evidence of record and assessed plaintiff's condition. R. 63-64. Dr. Chapman opined that

plaintiff had a mild restriction in her ability to perform activities of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  R. 64.  He concluded that plaintiff's "alleged psychiatric impairment is considered non-severe."  Id.

E.  Plaintiff's Hearing Testimony

Plaintiff, born October 3, 1987, was thirty years old at the time of the hearing.  R. 38. She is a high school graduate and a single mother of a daughter (seven years old at the time).  R. 39.  Plaintiff and her daughter live in an apartment with plaintiff's mother, brother, sister and two nieces.  R. 39. 49-50.  Plaintiff worked on-and-off for six years as a supervisor at Starbucks until February 2016, when she stopped working because she "was panicking" and "was really, really stressed out."  R. 40-41.  Plaintiff testified that she had been "stressed out for a long time" and tried to hide it; she knew she had a problem but did not want to deal with it.  R. 41.  Out of concern for her daughter, she finally went to the hospital to seek treatment.  Id.  Plaintiff testified that she was receiving treatment at Montefiore Health Center (therapy every other week and medication management once a month).  R. 43-44.  She stated that she takes the medication as prescribed, but it makes her very tired.  R. 45-46.  She also drinks alcohol a few times a week (when she gets "really stressed – stressed out").  R. 46-47.

Plaintiff takes care of her daughter but her mother helps out.  R. 48.  Plaintiff tries to take her daughter to the park but she feels anxious when she is outside and around crowds.  Id. Plaintiff's sister takes plaintiff's daughter to school; plaintiff attends school programs and teacher's conferences.  R. 55.  Plaintiff's mother cooks for plaintiff and her daughter.  Id. Plaintiff cannot shop because she panics in the supermarket.  R. 49.  She gets panic attacks once every other day.  Id.  Sometimes she can control them after ten minutes of breathing exercises;

sometimes "if it's too overwhelming" she takes medication, which puts her to sleep within fifteen to thirty minutes. Id. Plaintiff tries to help clean up after her daughter (who is messy), but plaintiff does not mop the floors, vacuum or do laundry. R. 50. Plaintiff took a bus trip with her sister to Georgia for her niece's graduation, and had a panic attack during the ceremony. R. 51. She spends most of her days in the house, and goes to church every other Sunday with her boyfriend of two years. R. 52. Plaintiff's boyfriend is supportive; they do not go to dinner or the movies or anything like that because plaintiff does not like being outside around crowds. R. 52-53.

## II. LEGAL STANDARDS

A. Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). See 42 U.S.C. § 1383(c)(3). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Soc. Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are

supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

"However, where the proper legal standards have not been applied and 'might have affected the disposition of the case, the court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'" Velez v. Colvin, No. 14 Civ. 3084, 2017 WL 1831103, at *15 (S.D.N.Y. June 5, 2017) (citing Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004)). Thus, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in relation to the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.  Statutory Disability

A claimant is disabled under the Social Security Act ("the SSA") when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[4]  In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security Regulations set forth a five-step sequential analysis for evaluating whether a person is disabled under the SSA:

> (1) whether the claimant is currently engaged in substantial gainful activity;
>
> (2) whether the claimant has a severe impairment or combination of impairments;
>
> (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments;
>
> (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and
>
> (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

McIntyre, 758 F.3d at 150 (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v)).  The claimant bears the burden of proof as to the first four steps of the process.  See Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).  If the claimant proves that his impairment prevents

---

[4]  Many of the regulations and Social Security Rulings cited herein have been amended subsequent to the ALJ's decision. For the sake of brevity, I discuss (and have applied) the relevant regulations/rulings as they existed at the time of the ALJ's decision.

him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. See Brault, 683 F.3d at 445.

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is required to utilize a "special technique" at the second and third steps. See Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a, 416.920a. At step two, in determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's degree of functional limitation in four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the claimant's mental impairment or combination of impairments is severe, then at step three the ALJ must "compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)). See also 20 C.F.R. § 416.920a(d)(2). If the claimant suffers from a severe impairment which is not listed (or equivalent in severity to a listed mental disorder), then the ALJ must assess the claimant's residual functional capacity. See Kohler, 546 F.3d at 266 (citing § 404.1520a(d)(3)). See also 20 C.F.R. § 416.920a(d)(3).

### III. THE ALJ'S DECISION

To assess plaintiff's disability claim, the ALJ followed the five-step sequential analysis and applied the "special technique" at steps two and three. See 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920a and discussion, *supra*. At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since February 22, 2016 (the alleged onset date). R. 22. At step two, the ALJ concluded that plaintiff has the following severe impairments: panic

-14-

disorder; major depressive disorder; PTSD; and anxiety disorder. Id.

At step three, the ALJ determined that plaintiff's impairments (individually or combined) do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 23-24. Specifically, the ALJ found that plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06 or 12.15. R. 23.[5] In making this finding, the ALJ first considered whether the "paragraph B" criteria are satisfied. Id. "To satisfy the 'paragraph B' criteria, the mental impairment must result in one extreme or two marked limitations in a broad area of functioning." Id. The ALJ found that plaintiff has mild limitations in understanding/remembering/applying information, moderate difficulties in her ability to interact with others, mild difficulties with concentration/persistence/maintaining pace and mild limitations in adapting/managing oneself. Id. Thus, the ALJ concluded that the "paragraph B" criteria are not satisfied. Id. The ALJ also considered whether the "paragraph C" criteria are satisfied, and concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." R. 24. Finally, the ALJ noted that the limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, whereas the mental residual functional capacity ("RFC") assessment used at steps 4 and 5 "requires a more detailed assessment of the areas of mental functioning." Id. Accordingly, the ALJ noted that his RFC assessment "reflects the degree of limitation [I have] found in the 'paragraph B' mental functional analysis." Id.

---

[5] Listing 12.04 is the listing for "depressive, bipolar and related disorders." See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Listing 12.06 is the listing for "anxiety and obsessive-compulsive disorders." See id., § 12.06. Listing 12.15 is the listing for "trauma- and stressor-related disorders." See id., § 12.15.

Next, the ALJ assessed plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. However, she is limited to occasional interaction with coworkers and no interaction with the general public. She retains the ability to adapt to changes in the workplace on a basic level.

Id. In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence" in accordance with 20 C.F.R. §§ 404.1527, 404.1529, 416.927 and 416.929, and the Social Security Ruling 16-3p. Id.

At step four, the ALJ determined that plaintiff is unable to perform any past relevant work. R. 27. At step five, based upon the vocational expert's testimony, the ALJ concluded that plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. 27-28. Thus, the ALJ found plaintiff "not disabled" as defined in the SSA. R. 28.

## IV. DISCUSSION

A. Evaluating Plaintiff's Statements and Allegations

Plaintiff argues that the ALJ incorrectly discounted her testimony about her symptoms and conditions. Specifically, plaintiff contends that the ALJ failed "to provide the required detailed credibility analysis utilizing all the criteria in *SS 96-7p*" and 20 C.F.R. § 404.1529. Dkt. #20, at 13 (italics in original). Under the statute, when a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists (if such evidence is available), See 20 C.F.R. §§ 40.1529(c)(2), 416.929(c)(2). Further, if a claimant's reported symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, consideration is also given to such factors as: (1) the claimant's

daily activities; (2) the location, duration, frequency and intensity of pain and other symptoms;

(3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and adverse side

effects of medication; (5) treatment (other than medication) that the claimant receives or had

received; (6) any measures a claimant uses to relieve pain or other symptoms; and (7) other

factors concerning functional limitations and restrictions due to pain or other symptoms. See 20

C.F.R. §§ 40.1529(c)(3), 416.929(c)(3). Additionally, effective March 28, 2016, S.S.R. 96-7p

was superceded by S.S.R. 16-3p for the purpose of providing

> guidance about how [to] evaluate statements regarding the intensity, persistence,
> and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL
> 1119029, at *1. . . . S.S.R. 96-7p . . . placed a stronger emphasis on the role of
> the adjudicator to make a "finding about the credibility of the individual's
> statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996
> WL 374186, at *1. In contrast, S.S.R. 16-3p espouses a more holistic analysis of
> the claimant's symptoms, and "eliminate[s] the use of the term 'credibility' " from
> sub-regulation policy. S.S.R. 16-3P, 2016 WL 1119029, at *1. The
> Commissioner notes that the "regulations do not use this term," and by
> abandoning it, "clarif[ies] that subjective symptom evaluation is not an
> examination of an individual's character." Id.

Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

Here, the ALJ considered plaintiff's "symptoms and the extent to which these symptoms

can reasonably be accepted as consistent with the objective medical evidence and other

evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR16-3p." R. 24.

The ALJ discussed plaintiff's mental health treatment history and found that her "sporadic

participation in conservative mental health treatment is inconsistent with disabling mental

impairment." R. 25. The ALJ also found that plaintiff's "continued noncompliance with

prescribed treatment and ongoing alcohol use also suggest her symptoms are not as severe as

alleged." Id. The ALJ discussed the mental health treatment notes and consultative

examination findings, and concluded they were inconsistent with plaintiff's allegations of

disabling symptoms.  R. 25-26.  Finally, the ALJ found that plaintiff's "activities of daily living ["ADLs"] are also inconsistent with disabling mental impairment."  R. 26.  Specifically, the ALJ noted:

> For example, the claimant testified she receives significant assistance from her family in caring for her seven-year-old daughter and she does not perform basis household chores.  However, in early 2018, when she re-established mental health treatment, she reported living alone with her daughter. [R. 352.] Around the same time, she reported getting her nails done for the first time in one year. [R. 347.] Two years earlier, she also reported she could perform personal care, shop, manage her finances, and use public transportation despite anxiety. [R. 314.] The claimant reported dating during the relevant period and testified she attends her daughter's school programs, which are inconsistent with reports of disabling social anxiety. [R. 52, 55, 348, 352.]

Id.

Plaintiff more narrowly assails the ALJ's discussion of ADLs:

> That the Plaintiff "had her nails done" after a prolonged period of personal neglect, realized a relationship, and/or attended teacher conferences and programs when she felt up to it, does not imply such psychological functional improvement as to perform competitive work, but rather that the Plaintiff has been trying to find her way back to more normal and satisfying life. .
> And the use of public transit and attendance at school programs and conferences does not reasonably support inferences that the Plaintiff could or did attend programs and conferences or travel on public transport unaccompanied or during times of emotional disturbance.

Dkt. #20, at 11.  Plaintiff's argument is unavailing.  Even in the absence of a consideration of plaintiff's ADLs, the ALJ relied upon a number of factors in discounting plaintiff's asserted inability to function due to mental impairments.  At bottom, the ALJ's rationale comports with statutory and regulatory requirements and is supported by substantial evidence.

B.  Duty to Develop the Record

Plaintiff argues that the ALJ erred by failing to obtain medical source statements from plaintiff's mental health providers.  It is well-settled that the ALJ has an affirmative obligation to develop the record.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  The duty arises

from SSA regulations, which require the ALJ to develop a claimant's "complete medical history" for at least twelve months prior to the month in which the claimant filed an application for benefits or, if the claimant says the disability began less than twelve months prior to filing, beginning with the month the disability allegedly began (absent reason to believe it began earlier). See 20 C.F.R. §§ 404.1512(b)(1)(ii), 416.912(b)(1)(ii). "To be sure, the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014 (citation omitted). "The obligation to develop the record is enhanced when the disability in question is a psychiatric impairment." Marinez v. Comm'r of Soc. Sec., 269 F. Supp.3d 207, 215 (S.D.N.Y. 2017) (internal quotation marks omitted). "However, the duty to develop the record is not absolute, and requires the ALJ only to ensure that the record contains sufficient evidence to make a determination." Johnson v. Comm'r of Soc. Sec., No. 17 Civ. 5598, 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quotation marks and citation omitted). Thus, "an ALJ's failure to request medical source opinions is not per se a basis for remand where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC].'" Greenhaus v. Berryhill, No. 16 Civ. 10035, 2018 WL 1626347, at *9 (S.D.N.Y. Mar. 30, 2018) (quoting Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013)). See Monroe v. Commissioner, 676 F. App'x 5, 8-9 (2d Cir. 2017) (reaffirming principle that a medical source statement or formal medical opinion is not necessarily required where the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity); Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (absence of medical source statement from a claimant's treating physician is not always fatal to

the ALJ's determination).  The need for a treating physician's medical source statement hinges "on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." Sanchez v. Colvin, No. 13 Civ. 6303, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015).

Here, the ALJ requested and received medical records detailing plaintiff's mental health treatment at Montefiore Behavioral Health Center for anxiety and depression, including treatment notes from therapy and medication management sessions, affording the ALJ a comprehensive history of plaintiff's symptoms and medication regimen.  The ALJ also had the opinions of consultative psychiatrist Dr. Phillips and nonexamining agency psychologist A. Chapman.  The ALJ noted that the findings in plaintiff's treatment records were consistent with her presentation during the consultative examination.  R. 25-26.  Under the circumstances of this case–given the objective medical evidence combined with the consultative opinions–there is no discernable gap in the record and, thus, no basis to remand on the ground that the ALJ failed to obtain a treating source opinion.  See Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (ALJ had no obligation to obtain medical source statement from treating physician where ALJ's decision was largely supported by consultative physician's opinion, and the record contained all treatment notes from claimant's treating physicians); Hill Ogletree v. Saul, No. 19 Civ. 7208, 2020 WL 3171354, at *11-12 (S.D.N.Y. June 15, 2020) (no obligation to obtain treating source opinion where ALJ relied on objective medical evidence and non-treating opinions); Peterson v. Berryhill, 17-CV-6397, 2018 WL 4232896, at *4 (W.D.N.Y. Sept. 5, 2018) (finding that the ALJ fulfilled his duty to develop the record where the record contained effective summaries of plaintiff's treatment history, medication, estimated mental status and diagnoses).

C. RFC Assessment

In determining plaintiff's RFC, the ALJ gave "significant weight" to the consultative examiner's opinion:

> The consultative examiner, Ruby Phillips, [Ph.D.], opined that the claimant demonstrated no evidence of limitation in ability to follow or understand simple directions and interactions, perform simple tasks independently, maintain attention or concentration, maintain a regular schedule, perform or learn new tasks, and make appropriate decisions. Although she exhibited moderate limits in her ability to relate adequately with others and appropriately deal with stress secondary to anxiety, these limitations were not significant enough to interfere with her ability to function on a daily basis (Ex. 3F). This opinion was based on a one-time examination, but it is generally consistent with the claimant's [ADLs], including her ability to care for her daughter, manage her finances, shop, and use public transportation despite anxiety.

R. 27. Plaintiff argues that Dr. Phillips' opinion was based on a "snapshot" evaluation and, therefore, "cannot provide probative support" for the ALJ's RFC determination. Dkt. #20, at 10. I disagree.

"An appropriate consultative report, combined with other evidence in the record, can provide substantial evidence for an ALJ's RFC determination and disability decision notwithstanding a lack of medical reports from treating physicians." Rivera v. Comm'r of Soc. Sec., 368 F. Supp.3d 626, 644 (S.D.N.Y. 2019). Here, Dr. Phillips' assessment of plaintiff's limitations was supported by her mental status examination findings, which were generally unremarkable except for plaintiff's "anxious" affect and "fair" insight and judgment. R. 313-14. Further, the ALJ correctly noted that Dr. Phillips' mental status examination findings were consistent with treatment records from Montefiore Behavioral Health Clinic (discussed in detail, supra), which reflect "only minimally abnormal clinical signs and findings." R. 25-26. The ALJ also noted that Dr. Phillips' assessment was generally consistent with plaintiff's ADLs. R. 27. Moreover, the ALJ's RFC assessment incorporated Dr. Phillips' opinion that plaintiff is moderately limited in her ability to relate adequately with others and appropriately deal with

-21-

stress, by limiting plaintiff to jobs that require only occasional interaction with co-workers, no interaction with the public and adaptation to workplace changes on a basic level.  R. 26.[6]  In sum, Dr. Phillips' opinion, combined with largely unremarkable mental status examination findings in the treatment record and plaintiff's ADLs, provide substantial evidence for the ALJ's RFC determination.

## V.  CONCLUSION

For the reasons set forth above, the Commissioner's motion is **GRANTED** and plaintiff's motion is **DENIED**.

The Clerk of the Court is directed to terminate the pending motions (Dkt. #19, #23) and close this case.

Dated: September 23, 2020     **SO ORDERED**
   White Plains, New York

PAUL E. DAVISON, U.S.M.J.

---

[6] The ALJ gave "little weight" to the state agency reviewer's opinion that plaintiff had mild difficulties in maintaining social functioning, in light of evidence received at the hearing level, including updated mental health treatment notes "which are consistent with more than mild psychological limitations in [plaintiff's] ability to interact with others."  R. 26.